L5HGBALD

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4              v.                          20 Cr. 281 (KPF)

5  SOULEYMANE BALDE,

6                                          Decision
                   Defendant.
7  ------------------------------x

8
                                          New York, N.Y.
9                                         May 17, 2021
                                          11:30 a.m.
10

11 Before:

12                 HON. KATHERINE POLK FAILLA,

13                                         District Judge

14                        APPEARANCES

15 AUDREY STRAUSS
        United States Attorney for the
16      Southern District of New York
   MARY CHRISTINE SLAVIK
17 KIERSTEN FLETCHER
        Assistant United States Attorney
18
   JENNIFER WILLIS
19      Attorney for Defendant

20

21

22

23

24

25

L5HGBALD

```
1            (The Court and all parties present remotely)

2            THE DEPUTY CLERK:  Your Honor, this is in the matter

3    of USA v. Balde.

4            Counsel, please state your names for the record,

5    beginning with the government.

6            MS. SLAVIK:  Good morning, your Honor.  Christine

7    Slavik for the United States.  I'm joined on the line by my

8    colleague AUSA Kiersten Fletcher.

9            THE COURT:  Good morning.  And thank you to both of

10   you.

11           Representing Mr. Balde?

12           MS. WILLIS:  Good morning, your Honor.  Jennifer

13   Willis on behalf of Mr. Balde.

14           THE COURT:  Thank you very much.

15           And is Mr. Balde on the line as well?

16           MS. WILLIS:  He is, your Honor.

17           THE DEFENDANT:  Yes.  Good morning to the Court.

18           THE COURT:  Of course, sir.  Good morning.  And thank

19   you very much.

20           Ms. Willis, as this is an oral decision in this

21   matter, it is a proceeding to which your client has the right

22   to be present.  He also has the right to waive this ability and

23   to have the matter take place by telephone.  After speaking

24   with him about this matter, do you understand that it's his

25   wish to proceed by telephone?
```

L5HGBALD

1              MS. WILLIS:  Yes, your Honor.

2              THE COURT:  Thank you.  May I confirm that please,

3     with Mr. Balde.

4              MS. WILLIS:  Yes, your Honor.

5              THE DEFENDANT:  Yes.

6              THE COURT:  Mr. Balde, do I understand that you are

7     comfortable proceeding by telephone today, rather than an

8     in-person proceeding?

9              THE DEFENDANT:  Yes, your Honor.

10             THE COURT:  Thank you, sir.  And so we will proceed by

11    telephone.  I want to thank you all for agreeing to participate

12    by phone.

13             I also want to thank you all for your patience.  This

14    may have seemed like an easy matter to each side, but it was

15    not to me.  And each time I thought I was ready to decide it, I

16    found some other rabbit hole to go down, so I appreciate the

17    patience that you extended to me in letting me take the time I

18    needed to think through these very, very important issues.  It

19    is very much a compliment to the excellent oral and written

20    presentations that I received from both sides that it took me

21    this long to decide it.  I also do want to pause for a moment

22    and to extend my condolences to Mr. Balde and his family for

23    their recent loss.  Again, they have our condolences, mine and

24    my chambers'.

25             I will now begin, and I will read into the record the

L5HGBALD

| | |
|---|---|
| 1 | oral decision in this matter.  For me, it is a bit lengthy. |
| 2 | And yet, it is easier for me to read this than to make it into |
| 3 | a written decision.  So if that means that folks will be |
| 4 | putting the phone on mute and just sort of going about their |
| 5 | business while they are listening to this, I certainly |
| 6 | understand.  But we are here today for a decision on |
| 7 | Mr. Balde's motion to dismiss the indictment, an indictment |
| 8 | that was filed on June 3rd of 2020.  And that indictment was |
| 9 | returned by a grand jury sitting in White Plains, New York and |
| 10 | drawn from a jury wheel consisting of residents of Westchester, |
| 11 | Putnam, Rockland, Orange, Sullivan, and Dutchess Counties. |
| 12 | Mr. Balde -- whose alleged offense, unlawful possession of a |
| 13 | firearm by an alien, occurred in Bronx County -- moves for |
| 14 | dismissal on the basis of the government's use of a White |
| 15 | Plains grand jury to obtain an indictment in a case that is to |
| 16 | be tried in Manhattan by petit jurors drawn from New York, |
| 17 | Bronx, Westchester, Putnam, and Rockland Counties violated his |
| 18 | rights under the Fifth and Sixth Amendment to the United States |
| 19 | Constitution and the Jury Selection and Service Act, which I |
| 20 | will refer to at times as the JSSA, contained at §1861 to 1878 |
| 21 | of Title 18 of the United States Code.  And for the reasons |
| 22 | that I'm about to outline, I am denying this motion. |
| 23 |         I'm going to give just a very brief summary of the |
| 24 | prior proceedings in this matter, the proceedings that bring us |
| 25 | to this point.  As I know the parties know, this is the second |

L5HGBALD

1    case involving the same allegations against Mr. Balde.  The

2    first indictment was filed on February 17th of 2016.  Mr. Balde

3    pleaded guilty pursuant to a conditional guilty plea on

4    June 6th, 2017.  Judgment was imposed on October 12th of 2017.

5    Mr. Balde was sentenced principally to a term of 23 months'

6    imprisonment.

7         Mr. Balde, as contemplated by the conditional guilty

8    plea appealed the denial of his pretrial motion to dismiss.

9    And that appeal was initially decided in the government's favor

10   by the Second Circuit.  But the opinion was withdrawn and

11   superseded on rehearing.  Following the Supreme Court's

12   decision in the *Rehaif v. United States*, 139 S. Ct. 2191, and

13   that's shown at 943 F.3d 73.  And in that decision, the Second

14   Circuit vacated Mr. Balde's conviction and remanded it to this

15   court for further proceedings.

16        On remand, Mr. Balde filed a motion to dismiss the

17   indictment, which I granted without prejudice on May 21st of

18   2020.  And that same day, the government filed the criminal

19   complaint that yielded ultimately this matter alleging the same

20   underlying conduct.  An indictment was obtained on June 3rd of

21   2020 from the Southern District of New York by a grand jury

22   sitting in White Plains.  That grand jury was the only one

23   available at that time, due in part to a November 30th, 2020

24   order from then-chief judge Colleen McMahon temporarily

25   suspending the additional impanelment of grand juries.  The

L5HGBALD

1   case was designated for Manhattan in accordance with Rule 6 of

2   the local rules for the division of business among district

3   judges, I will call those occasionally the business division

4   rules, and it was reassigned to this court on June 8th of 2020.

5   On June 9th, Mr. Balde filed a motion for access to records

6   concerning the creation of the master and qualified jury wheels

7   for this district as relevant to the composition of the grand

8   jury that returned the indictment against him.

9           On June 30th of 2020, the Court held a telephonic

10  conference with the present parties, as well as the jury

11  administrator for the Southern District of New York, the

12  counsel to the clerk of court for the Southern District of New

13  York, and counsel in several other cases in which similar

14  motions were made.  Following that conference, there was a

15  schedule for the defendant to file a request for records.  A

16  protective order was issued and entered on August 4th of 2020.

17  In August and September of 2020, the Court continued to work

18  with the parties, the jury administrator, and other personnel

19  to identify and obtain relevant records requested by Mr. Balde.

20  On October 14th of 2020, the Court set a schedule for briefing

21  and oral arguments on Mr. Balde's motion to dismiss the

22  indictment.  The motion was filed in November and opposed and

23  replied in December.  The Court heard oral argument on

24  January 7th of 2021.  And I'll now begin.

25          Mr. Balde's motion to dismiss the indictment raises

L5HGBALD

1    three interrelated arguments.  First, he argues that the

2    government's decision to obtain the indictment from the White

3    Plains grand jury, which grand jury was constituted from a

4    population that is not demographically representative of the

5    community in which Mr. Balde committed the alleged offense and

6    in which a trial would occur violated his right under the Sixth

7    Amendment to a grand jury drawn from a fair cross-section of

8    the community.  Second, Mr. Balde argues that the government's

9    conduct violated his Fifth Amendment right to equal protection

10   of the laws by discriminating against minorities as potential

11   grand jurors.  Third, and finally, he argues that the use of

12   the White Plains grand jury for a Manhattan case violated his

13   rights under the JSSA because it constituted a substantial

14   failure to comply with the JSSA's requirement that a grand jury

15   be randomly selected from a fair cross-section of the

16   community.  The government responds that there was nothing

17   improper by their use of the White Plains grand jury to obtain

18   the indictment against the defendant and that each of these

19   three claims should be denied.  As I'm about to explain, the

20   Court concludes that the defendant has not established a

21   violation of his rights under the Fifth or Sixth Amendment or a

22   substantial failure to comply with the JSSA.

23           In arriving at this decision, I have looked at some

24   recent cases that have come in from other judges in this

25   district.  They're not dispositive and they don't take the

L5HGBALD

place of my analysis, but I know the parties are aware of them,
and I'll just mention them by name and docket number: *United
States v. Allen*, 20 Cr. 366; *United States v. Schulte*, 17 Cr.
548; *United States v. Tagliaferro,* 19 Cr. 472; *United States v.
Chandler*, 19 Cr. 867; and *United States v. Jarrett,* 19 Cr. 670.
These cases, however, have varying degrees of factual and
procedural similarity to this case.  So while we all might
arrive at the same or nearly the same results, we do come to it
from different ways.

        I'm now turning to the division of business and the
jury composition in the Southern District of New York.  And by
statute, United States district courts in New York State are
divided among four districts; Northern, Southern, Eastern, and
Western.  And that's contained in 28 U.S.C. §112.  The Southern
District of New York comprises, Bronx, Dutchess, New York,
Orange, Putnam, Rockland, Sullivan, and Westchester Counties.
The courthouses are located in Manhattan and White Plains.  The
district is not further subdivided into divisions by statute,
but rather the division of business between the Manhattan and
White Plains courthouses is the result of the district's
internal business division rules.  As relevant here, Rule 6(a)
of those rules provides that indictments designated from
Manhattan may be returned by the grand jury in open court to
the magistrate judge presiding in the criminal part.
Indictments designated for White Plains may be returned by the

L5HGBALD

grand jury to the magistrate judge presiding in the White

Plains courthouse.  A criminal matter will be designated to

White Plains by the United States attorney if the crime was

allegedly committed in whole or predominant part in the

northern counties.  And that's business division Rule 18(b).

The rules go no further in addressing grand jury operations nor

the division of criminal business.  And they also do not

designate the grand jury from which the government must seek an

indictment in any particular case.  As stated somewhat

differently, the district's own rules neither expressly

prohibit nor expressly permit the government's actions in this

case.

          The district's jury plan, which was last modified in

2009, sets forth a multistep process for the identification,

qualification, and selection of jurors.  The district maintains

two master jury wheels; one for the Manhattan courthouse, which

includes residents of the counties of New York, Bronx,

Westchester, Putnam, and Rockland, and the other for White

Plains, which includes residents of the counties of

Westchester, Putnam, Rockland, Orange, Sullivan, and Dutchess.

Members of the master jury wheels are selected randomly from

voter registration lists and in proportionate share from each

county.  Because Westchester, Putnam, and Rockland Counties are

represented in both master jury wheels, residents of those

counties are proportionately split between the jury wheels so

L5HGBALD

as to reasonably reflect the relative number of registered

voters in each county within the respective master jury wheels.

The master jury wheels are regenerated every four years, no

later than September 1st in the year following each

presidential election.

        To build the qualified jury wheels, the clerk of court

determines approximately how many jurors will be needed to meet

the Court's demands for the next six months plus a margin of

extra names.  This number of persons is then randomly drawn

from each master jury wheel, and those potential jurors are

sent a questionnaire regarding their qualifications and

availability for jury service.  The questionnaires come with

instructions that they are to be completed and returned within

ten days.  The returned questionnaires are evaluated for

completeness and eligibility.  And all persons to be determined

to be eligible constitute the qualified jury wheels.

        Approximately once a month, the clerk of court

determines the anticipated juror needs for the ensuing month

and sends summonses to the necessary number of persons chosen

at random from the qualified jury wheels.  Those summoned are

then randomly assigned to grand and petit jury panels as

needed.  The jury plan also sets forth categories of

individuals who are automatically exempt from jury service,

excusable on request or disqualified, as well as the criteria

judges should use to determine other individuals who may be

L5HGBALD

1    excused for other reasons.

2              As set forth in Mr. Balde's expert's report, which is

3    uncontested in relevant part by the government, the jury

4    eligible population for the entire Southern District of New

5    York in 2018 was 18.09 percent black or African-American and

6    23.41 percent Hispanic or Latino.  In the counties feeding the

7    Manhattan master jury wheel, the jury eligible population in

8    2018 was 20.92 percent black or African-American and

9    28.06 percent Hispanic or Latino.  In the counties feeding the

10   White Plains master jury wheel, the jury eligible population in

11   2018 was 12.45 percent black or African-American and

12   14.12 percent Hispanic or Latino.

13             Now, to begin with Mr. Balde's claims, we begin with

14   his claims that his right under the Sixth Amendment and the

15   JSSA to a jury drawn from a fair cross-section of the community

16   was violated when the government obtained the indictment from

17   the White Plains grand jury, even though the alleged offense

18   occurred in the Bronx and the trial was to be held in

19   Manhattan.  And this is because Mr. Balde argues that the

20   demographics of the White Plains jury pool are substantially

21   different from the demographics of both the Manhattan jury pool

22   and the district as a whole.  Specifically, the White Plains

23   jury pool has smaller black or African-American and Hispanic or

24   Latino populations than both the Manhattan jury pool and the

25   district as a whole.  Looking at the applicable law, the text

L5HGBALD

1   of the Sixth Amendment provides that a defendant is entitled to

2   trial by an impartial jury of the state and district wherein

3   the crimes shall have been committed.  This right has been

4   interpreted to require trial by a jury selected from a fair and

5   representative cross-section of the community.  One case for

6   this proposition, I cite *Taylor v. Louisiana,* 419 U.S. 522, a

7   Supreme Court decision from 1975.  A few years later in *Duren*

8   *v. Missouri,* the Supreme Court articulated a three-part test

9   that defendants must meet in order to establish a prima facie

10  violation of the fair cross-section requirement.  Number one,

11  the excluded group must be distinctive.  Number two,

12  representation of this group in venires from which juries are

13  selected is not fair and reasonable in relation to the number

14  of such persons in the community.  And third, the

15  underrepresentation must be due to systematic exclusion of the

16  group in the jury selection process.  The *Duren* case is

17  reported at 439 U.S. 357 from 1979.

18          The JSSA sets forth the policy that all litigants in

19  federal court entitled to trial by jury shall have the right to

20  grand and petit juries selected at random from a fair

21  cross-section of the community in the district or division

22  wherein the court convenes.  I'm quoting here from 28 U.S.C.

23  §1861.  The Second Circuit has held in this regard that fair

24  cross-section challenges brought under the JSSA must also be

25  analyzed using the *Duren* test.  And this is stated principally

L5HGBALD

in the case of *United States v. LaChance*, 788 F.2d 856 (2d Cir.

1986).  As a result, if a fair cross-section challenge fails

under the Sixth Amendment, it also fails under the JSSA.

Although it's not clear that the converse is necessarily the

case, I admitted the possibility that there may be a JSSA case

that would survive even where the Sixth Amendment fair

cross-section claim failed.  If the defendant makes a prima

facie showing under *Duren,* the state may rebut it by showing a

significant state interest behind the selection process at

issue.

          Now, as to the first *Duren* prong, whether the excluded

groups -- blacks or African-Americans or Hispanics or

Latinos -- are distinctive, there is no dispute between the

parties that they are.  And for this reason, I'll move to the

second prong, which is whether these groups are fairly and

reasonably in venires in rough proportion to their numbers in

the relevant community.

          And so beginning first with the question of community,

let me begin this section by reiterating what happened here.

The government sought the operative indictment in June 2020.

And due to the COVID-19 pandemic, the district had only one

operating grand jury sitting in White Plains.  There was no

grand jury sitting in Manhattan, and it was unknown when grand

jury operations in Manhattan would resume.  And as a result,

the government obtained the indictment from the White Plains

L5HGBALD

grand jury, even though Mr. Balde's conduct is alleged to have
occurred in the Bronx and the government intended to try the
case in Manhattan.  The parties first disagreement on this
point is which community is the relevant one for purposes of
the Sixth Amendment and the JSSA fair cross-section analysis.
Just for some thoughts on that, the issues involve whether
community is defined more narrowly than district, if the
district does not have statutory subdivisions.  And if that is
the case, is the relevant community the community where the
alleged crime occurred or the trial will be held or a given
jury, either grand or petit sits?  An issue is whether these
communities, must they all be the same or can the relevant
communities be different at the grand jury stage than it is at
trial?  And how do varying demographics affect the answers to
these questions?

        The defendant argues that, in general, the government
must obtain an indictment and go to trial in the same
community, and that community should be where the alleged
offense occurred.  Mr. Balde argues that because the district
has chosen to divide its business into a White Plains division
and a Manhattan division, as the term division is defined in
the JSSA, in §1869(e), and because the district maintains a
separate master and qualified jury wheel for each, the
government is largely bound to adhere to those divisions when
it indicts and tries cases.  That said, the defense does admit

L5HGBALD

that if an indictment is obtained in one location and trial is
to occur in a different location, there can still be Sixth
Amendment compliance, if the demographics of the two locations
are sufficiently similar and no distinctive group is
substantially underrepresented in one as compared to the other.
In this case specifically, that means that because Mr. Balde's
alleged criminal conduct occurred in the Bronx, Bronx County
provides potential jurors to the Manhattan division and the
White Plains jury pool is demographically distinct from both
the Manhattan jury pool and the district as a whole, in order
to comply with the fair cross-section requirement, the
government was obligated to obtain the indictment from a
Manhattan division grand jury.

          The government counters that Mr. Balde is entitled
only to a jury drawn from somewhere in the district and not to
a jury drawn from the entire district or from the counties
surrounding where the offense was committed.  The government
also notes that the relevant community for the grand jury may
be different than the relevant community for trial, with the
fair cross-section requirement being analyzed separately for
each.  In the government's estimation, the question for Sixth
Amendment purposes is whether the jury pool from which the
White Plains grand jury that indicted Mr. Balde was drawn was
fairly representative of the population of the counties
contributing to that jury pool.  To the government it is

L5HGBALD

1    irrelevant, and Mr. Balde is slated to be tried in Manhattan

2    and a trial will have a petit jury drawn from a community with

3    different racial demographics.

4            This court has thoroughly considered the parties'

5    arguments and drawn what it can from the precedent.  But the

6    cases identified by the parties and the other cases that the

7    Court has reviewed in its own research are generally quite fact

8    specific and distinguishable.  These issues are complicated and

9    there is no clear answer for the Court to merely adopt.  With

10   all of that said, the Court concludes that the weight of the

11   case law supports the government's position that the relevant

12   community for defendant's challenge to his indictment is the

13   population of the counties feeding the White Plains jury pool

14   from which his grand jury was drawn.  Beginning first with the

15   Second Circuit's decision in *United States v. Bahna,* which was

16   then certiorari denied *Soares v. United States,* I know that the

17   parties are very familiar with these cases because we discussed

18   them so deeply in oral argument.  And I'll therefore just

19   briefly summarize some salient facts.

20           That case arose in the Eastern District of New York.

21   The offense at issue occurred in Brooklyn.  The first trial was

22   held at the Brooklyn courthouse.  But after a new trial was

23   granted, defendant Soares was retried in Uniondale and

24   convicted a second time.  The Uniondale jury was selected from

25   different populations.  Mr. Soares alleged that there was an

L5HGBALD

1    underrepresentation of blacks and Hispanics in the Long Island

2    division as opposed to the Eastern District as a whole.  And he

3    therefore requested a panel drawn either from the entire

4    district or from Kings, Queens, and Richmond Counties.  The

5    Second Circuit found, "As a general rule, selections are to be

6    made from the area surrounding the courthouse where the case is

7    to be tried.  Under the district rules, jurors are selected

8    from the division in which the court sits."  The Court also

9    found that they were not prepared to say that the judicial

10   council in the Eastern District of New York erred in its

11   approval and that it is well settled that neither the jury

12   selection statute nor the Constitution requires that jurors be

13   drawn from an entire district.  Therefore, the Court found that

14   where a jury venire is drawn from a properly designated

15   division, we look to that division to see whether there has

16   been any unlawful or unconstitutional treatment of minorities.

17   To be clear, the jury at issue in *Bahna* was the petit jury.

18   But the Court did appear to include grand juries when it said

19   that, as a general rule, jury selections are made from the

20   areas surrounding the courthouse where the case is to be tried.

21   I do not interpret this to mean -- as I think Mr. Balde would

22   prefer -- that grand juries must be selected from the area

23   around where the trial will ultimately occur.

24          In this case, Soares does not appear to have objected

25   to the case being indicted in one location and tried in

L5HGBALD

1    another.  That is, of course, a claim that Mr. Balde does make.

2    But the Second Circuit found no issue with the grand jury that

3    indicted Mr. Soares and the petit jury that tried him being

4    drawn from different populations.  And that suggests for this

5    case that the relevant population for determining the

6    representativeness of the White Plains grand jury is the

7    population feeding the White Plains jury pool and not the

8    district as a whole or the division where the offense occurred.

9           Another case that we discussed in great depth was

10   *United States v. Plaza-Andrades*.  And that case arose in the

11   Northern District of New York, which at the time randomly

12   distributed criminal cases between the nonstatutory divisions

13   of the district, regardless of where the alleged offense

14   occurred.  Mr. Plaza-Andrades' offense occurred in Syracuse.

15   He was arraigned and had two pretrial hearings in Syracuse.

16   But the case was assigned to the district court in Utica for

17   trial.  And thereafter, Mr. Plaza-Andrades brought a 2255

18   motion arguing ineffectiveness because his counsel had failed

19   to challenge holding his trial in the Utica division.  The

20   Second Circuit found that the Northern District's random

21   assignment of criminal cases to different divisions based on a

22   neutral case assignment plan does not on its face constitute a

23   systematic exclusion of any group from jury service.  I'm

24   quoting here from the Second Circuit's decision, 507 F.

25   Appendix, the opening page is 22, but this was at Page 26.

L5HGBALD

1          The Second Circuit further found, as precedent makes

2     clear, that the Sixth Amendment does not entitle a defendant to

3     be tried in a geographic location any more specific than the

4     district where the offense was allegedly committed.  In this

5     regard, the circuit relied on the Sixth Amendment, but also on

6     a prior decision of its own, *United States v, Fernandez*, 480

7     F.2d 726(1973).  While this case seems to be helpful to the

8     government and was cited by the government as such, it would

9     appear to be distinguishable both because of the mechanism by

10    which the issue was raised and the fact that the assignment was

11    the result of a random process in which the prosecution played

12    no part.  The *Fernandez* decision, which is cited by

13    *Plaza-Andrades*, discussed a concern that too great leeway in

14    the selection of situs for trial leads to the appearance of

15    abuses, if not to abuses, in the selection of what may be

16    deemed a tribunal favorable to the prosecution.  And

17    understandably, Mr. Balde is suggesting that that concern is

18    present here, given the demographic disparities between

19    Manhattan and White Plains.

20         There is as well a Southern District decision from

21    1998, *United States v. Johnson*, reported at 21 F.Supp.2d 329,

22    and in that case the division of the district into White Plains

23    and Manhattan divisions, arguing generally that the jury pool

24    in the White Plains division did not adequately represent the

25    black and Hispanic populations in the community.  The Court

L5HGBALD

1    found, however, that the defendants had failed to satisfy the

2    second prong of the test, that they had not presented evidence

3    that the White Plains master wheel does not represent a fair

4    and reasonable cross-section of the community.  And instead,

5    the Court found that the arguments were based on the erroneous

6    assumption that the only proper community for the White Plains

7    courthouse is the entire Southern District.  In the *Johnson*

8    case, the Court also noted *Duren's* admonition or suggestion

9    that while community was not clearly defined, it was generally

10   accepted that the term referred to the district or division

11   where the trial is to be held.  Finally, the Court found that

12   so long as the division was not gerrymandered, it will

13   withstand constitutional scrutiny, even if the division differs

14   from the district as a whole in terms of its racial or

15   socioeconomic composition.  There the Court was quoting from

16   *United States v. Cannady,* a Ninth Circuit decision from 1995,

17   which in turn was also quoting a Tenth Circuit decision, *United*

18   *States v. Test.*  And because the White Plains division was

19   found to be merely drawn along county lines rationally

20   related -- one moment, please.

21        I'm understanding Mr. Balde has dropped off the call.

22   We'll pause at this time until I'm advised that he's back on.

23   Mr. Balde, have you rejoined the call?

24        MS. WILLIS:  Your Honor, I am back on the line now,

25   and I do have Mr. Balde with me on a merged call.

L5HGBALD

1          THE COURT:  Thank you very much.  I will go back to

2     this.

3          Ultimately, in *Johnson* -- and excuse me if I am

4     repeating myself -- the Court found that because the White

5     Plains division was merely drawn along county lines, rationally

6     related to the two courthouses and was not gerrymandered, the

7     overlap did not impinge on the defendant's Sixth Amendment

8     rights.  Now, in this case, Mr. Balde has pulled out and cited

9     to me the quote that "community generally refers to the

10    district or division where trial is to be held," and intuits

11    from that that because the trial was to be held in Manhattan,

12    the relevant community for purposes of grand jury selection was

13    also Manhattan.  However, the question that was presented and

14    answered by *Johnson* is whether it was permissible for the

15    district to maintain two separate jury wheels pulling from

16    different populations.  It found that it was.  It did not

17    answer the question whether the grand jury and the petit jury

18    must be drawn from the same pool and specifically the pool of

19    the division where trial will be held or where the offense was

20    committed.

21          The parties have asked me to look at two other cases,

22    which I have.  *United States v. Richardson*, 537 F.3d 951, an

23    Eighth Circuit decision from 2008.  And among other things, the

24    Court found there that the defendant, Richardson, did not have

25    a right to have his trial in or jurors summoned from a

L5HGBALD

1    particular division of the state and district where the crime

2    was committed.  And then in *Franklin v. United States*, a Fifth

3    Circuit decision from 1967, reported at 384 F.2d 377, the Court

4    found no constitutional guarantee that the accused had the

5    right to a trial in the division of the district in which the

6    offense was committed.

7         So in sum, what the Court derives from the cases I

8    have just been discussing is the following:  First, Mr. Balde

9    has the right under the Sixth Amendment and the JSSA to be

10   indicted by a grand jury and tried by a petit jury pulled from

11   populations within the Southern District of New York.  He is

12   not entitled to be both indicted and tried by juries pulled

13   from a subdivision of the state, even though the district has

14   exercised its discretion to split business between the two

15   courthouses.  Second, while it is the case in this district

16   that the grand jury and petit jury are generally drawn from the

17   same division within the district, this is not always true and

18   it is not constitutionally required.  And third, the relevant

19   population for determining jury pool representativeness is the

20   community in which each jury sits.  There is no constitutional

21   problem with Mr. Balde being indicted in White Plains -- again,

22   only because of COVID-related restrictions -- and tried in

23   Manhattan.  And whether the jury pool from which his grand jury

24   was drawn represented a fair cross-section of the community

25   must be determined with reference to the population of the

L5HGBALD

1    county feeding the White Plains jury pool, not with reference

2    to the district as a whole or to the Manhattan division.

3    Having concluded that the proper reference point is the

4    population of the counties constituting the White Plains

5    division, we now turn to the demographic makeup of the White

6    Plains master and qualified jury wheels as compared to the

7    overall demographic makeup of the counties from which they are

8    drawn.  And in this regard, the parties first dispute which

9    jury pool should be used to analyze Mr. Balde's fair

10   cross-section challenge.  Defendant contends that the White

11   Plains qualified jury wheel is the relevant jury venire,

12   whereas the government argues for the White Plains master

13   wheel.  There is no clear answer from the Supreme Court or the

14   Second Circuit regarding what constitutes the appropriate jury

15   venire to consider in this context.  In *United States v. Rioux,*

16   for example, the Federal Circuit observed that the relevant

17   jury pool may be defined by the master list, the qualified

18   wheel, the venires or a combination of the three, that's at 97

19   F.3d 648 a Second Circuit decision from 1996.  And several

20   district courts within this circuit have defined the relevant

21   jury pool with reference to the systematic defect identified by

22   the defendant, and so that would include both the lower court's

23   decision in *Rioux* from the District Court of Connecticut

24   reported at 930 F.Supp. 1558 if and the *Allen* decision that was

25   discussed earlier, which defined the jury pool as both the

L5HGBALD

1    White Plains master wheel and the White Plains qualified wheel,

2    because the allegations impacted both venires.  The bulk of

3    Mr. Balde's claims concern the construction of the master

4    wheel.  But in any case, and just to be clear, the Court finds

5    that the claims fail as to both wheels.

6         The parties also dispute the appropriate method of

7    statistical comparison.  Three options were provided; the

8    absolute disparity method, the comparative disparity method,

9    and the statistical decision theory.  Mr. Balde contends that

10   the data showed significant underrepresentation regardless of

11   which method is used.  The Second Circuit has strongly

12   suggested that the absolute disparity method is generally

13   appropriate -- and that's in the *Rioux* decision that I

14   mentioned earlier -- and that is therefore the method that this

15   court will use.

16        The absolute disparity method measures the difference

17   between the group's representation in the relevant community

18   and the representation in the jury venire.  And so, for

19   example, if African-Americans composed 10 percent of the

20   community but only 5 percent of the jury venire, the absolute

21   disparity would be 5 percent.  Under Second Circuit precedent,

22   absolute disparity nearly as high as 5 percent has not been

23   found to satisfy the underrepresentation element in *Duren*.  As

24   support for this, I cite to the parties *United States v.*

25   *Biaggi,* 909 F.2d 662, a Second Circuit decision from 1990, and

L5HGBALD

1    the *Allen* decision and an earlier decision, the *Barnes*

2    decision, 520 F.Supp.2d 510, a Southern District decision from

3    2007.  Here, the parties do not dispute that African-Americans

4    make up 11.2 percent and Hispanic-Americans make up 12.97

5    percent of the White Plains master wheel.  In the relevant

6    community, African-Americans make up 12.45 percent and

7    Hispanic-Americans 14.12 percent of the jury eligible

8    population.  The absolute disparities are therefore

9    1.25 percent for African-Americans and 1.15 for

10   Hispanic-Americans, and those figures fall comfortably within

11   the tolerated disparities in past precedents, leaving the Court

12   to conclude that Mr. Balde has not met the second element under

13   *Duren*.  But even if the White Plains qualified wheel were to be

14   used as the relevant jury venire, the absolute disparities

15   would be 3.69 percent and 3.64 percent, which are still

16   comfortably within the permissible range.

17          Mr. Balde's fair cross-section challenge fails on a

18   separate basis, though.  It fails because he has not

19   demonstrated the third element, systematic exclusion, which

20   requires a showing that the underrepresentation is due to a

21   systematic exclusion of the group in the jury selection

22   process.  And I'm quoting here from the *Duren* decision, 439

23   U.S. at 364.

24          In *Rioux,* the Second Circuit explained that there is

25   systematic exclusion when the underrepresentation is due to the

L5HGBALD

1    system of jury selection itself, rather than external forces.

2    I'm quoting here at 97 F.3d at 658.  Under the external forces

3    principle, by contrast, outside causes of underrepresentation,

4    such as demographic changes do not constitute systematic

5    exclusion.  Now, that is in the *Rioux* case, and it's also in

6    *Schanbarger v. Macy*, 77 F.3d 1424, a Second Circuit decision

7    from 1996.  For other circuits, *United States v. Little Bear*,

8    583 F.2d 211, a Second Circuit decision from 1978*; United*

9    *States v. Jones,* 2006 WL 278248 (E.D. La. Feb 3, 2006).  And in

10   thinking about the external forces principle and comparing it

11   to Mr. Balde's arguments in this case, I find that those

12   arguments are largely foreclosed by the principle.

13          So to begin, Mr. Balde first contends that the

14   government systematically excluded black or African-American

15   and Hispanic or Latino jurors by seeking the indictment in

16   White Plains, in lieu of the more racially diverse Manhattan

17   community.  But as previously mentioned, the reason the

18   government proceeded this way was because of an external force,

19   the COVID-19 pandemic and its substantial curtailment of

20   in-person proceedings throughout the district.  This was not

21   prosecutorial gamesmanship or forum shopping, as Mr. Balde

22   suggests.  And the circumstances do not establish systematic

23   exclusion.  Second, he argues that the jury plan's

24   replenishment of the master wheels only once every four years

25   constitutes systematic exclusion.  And this is so, according to

L5HGBALD

1   Mr. Balde, is because the four-year period causes addresses to
2   become stale as people move to new addresses.  And because
3   African-Americans and Hispanic Americans are on average younger
4   and more likely to move, he argues that these groups are
5   systematically excluded.  But even accepting the supposition
6   that these groups move more often, the Court remains
7   unpersuaded that this constitutes systematic exclusion within
8   the meaning of the Sixth Amendment because moving rates are an
9   external force and not a defect inherent in the jury plan.
10  Third, Mr. Balde asserts that the jury plan's exclusive
11  reliance on voter registration lists constitutes systematic
12  exclusion.  But this claim is foreclosed by the Second
13  Circuit's decision in *Schanbarger*, which held that a jury
14  venire drawn from voter registration lists violates neither the
15  Sixth Amendment's fair cross-section requirement nor the Fifth
16  Amendment's guarantee of equal protection.  Fourth, Mr. Balde
17  alleges that the exclusion of inactive voters in certain
18  counties within the White Plains division constitutes
19  systematic exclusion because African-Americans and
20  Hispanic-Americans are more likely to be inactive voters.  But
21  again, the alleged exclusion here is the result of forces
22  external to the jury plan, including, for example, people
23  moving.  And finally, Mr. Balde notes that jurors drawn from
24  the overlapping counties were inequitably prorated between the
25  two courthouses, but he has not shown that this alleged error

L5HGBALD

caused the underrepresentation at issue.  And in fact other

decisions -- the *Schulte* and *Allen* decisions that I

mentioned -- found the same error to have a minimal effect on

venires.  And perhaps underlying all of this is the fact that

the Court is accepting expert witness statements that the

dominant cause of the differences here include the fact that

African-Americans and Hispanic-Americans are less likely to

return juror questionnaires, more likely to be found not

qualified, and more likely to be excused.  Again, things that

are external to the jury plan.  And so as a result, I find that

Mr. Balde has not established the second and third elements

under *Duren*.  And his fair cross-section challenge under the

Sixth Amendment must be rejected.  And to the extent it's being

raised under the JSSA, it is also being rejected.

At our oral argument, defense counsel did not argue

Mr. Balde's Fifth Amendment claim, but rather characterized

that decision as a choice to not press the argument rather than

to drop the argument, and therefore, I will address it in the

interest of completeness.  In this regard, the equal protection

clause of the Fifth Amendment forbids as well the exclusion of

racial minorities from grand and petit juries, *Castaneda v.*

*Partida,* a Supreme Court decision from 1977 at 430 U.S. 482,

makes this point.  To raise a plausible equal protection

challenge against a jury selection system, a defendant must

show a recognizable group singled out for different treatment,

L5HGBALD

1  substantial underrepresentation over a significant period of

2  time, and that the selection procedure is susceptible to abuse

3  or not racially neutral.  Now, although this three-part test

4  resembles to some degree the Fifth Amendment framework, the

5  equal protection claims must additionally allege intentional

6  discrimination by the jury selection system at issue, and that

7  is made clear in the *Rioux* decision I mentioned earlier.

8          So here, Mr. Balde must furnish proof of

9  discriminatory intent.  It's also stated in the *United States*

10  *v. Biaggi* decision I mentioned earlier.  Now, although clear

11  statistical evidence may raise a presumption of intentional

12  discrimination in some cases, that presumption may be rebutted

13  by the government.  Here, Mr. Balde alleges that the racial

14  disparities in the jury pool are caused by clerical errors used

15  in processing alternate addresses, removal of inactive voters,

16  the decision to update the master jury wheel every four years,

17  and the allegedly improper proration of voters across

18  overlapping counties.  But all of these issues are facially

19  race-neutral, and their impact on the racial composition of the

20  wheels is neither inevitable nor substantially demonstrated.

21  Mr. Balde has further not shown how the jury plan might itself

22  potentially be susceptible to abuse.  For these reasons, the

23  Court is not persuaded that it can reasonably infer that the

24  jury plan is intentionally discriminatory, and Mr. Balde's

25  equal protection claim is denied.

L5HGBALD

1          That leaves me with Mr. Balde's JSSA claim.  And I'm

2     analyzing it at this point in the proceeding as something

3     different or slightly different from the fair cross-section

4     claim because, in addition to fair cross-section claims, the

5     defendant may also assert other violations of the JSSA if those

6     violations constitute a substantial failure to comply with its

7     own provisions.  And that's from the *LaChance* decision and also

8     the *Allen* decision that makes the point.  Mere technical

9     violations of the JSSA are not actionable, again, from

10    *LaChance.*  And whether a violation is substantial or merely

11    technical depends upon the nature and extent of its affect on

12    the wheels and the venire from which a defendant's grand jury

13    was derived.  I'm quoting here from *LaChance.*  Determining

14    substantial compliance requires weighing the violation against

15    the goals of the act.  Now, with respect to the defendant,

16    Mr. Balde's, JSSA arguments, here he focuses frequently on

17    absolute numbers, while the government focuses on percentages.

18    And while discussing earlier the fair cross-section cases, the

19    Court's research shows largely coextensive analyses in that the

20    differences, the disparities that are proffered are frequently

21    viewed through the lens of the magnitude of

22    underrepresentation.

23          Now, earlier in this opinion, I noted one policy of

24    the JSSA was to ensure that all litigants in federal courts

25    shall have the right to grand and petit juries selected at

L5HGBALD

1    random from a fair cross-section of the community.  But there
2    is as well a second policy that all citizens shall have the
3    opportunity to be considered for service on grand and petit
4    juries in the district courts of the United States.  In the
5    Court's estimation, the first policy objective is presumably
6    why other courts have focused on underrepresentation.  Here,
7    the defendant's interest is in a fair cross-section.  None of
8    the issues that Mr. Balde raised has appeared to substantially
9    interfered with achievement of that fair cross-section.  Some
10   of the choices in the jury plan do implicate the second policy
11   objective, but there are practical reasons for them.  Here,
12   Mr. Balde's claims overlap nearly completely with the Sixth
13   Amendment fair cross-section claims, and I'm going to be
14   denying it for largely the same reasons.  Mr. Balde contends
15   that the following defects constitute substantial violations of
16   the JSSA:  They include the government's decision to seek the
17   indictment from White Plains and not Manhattan; the exclusion
18   of inactive voters from certain counties located in the White
19   Plains division; the allegedly erroneous proration of jurors
20   from the counties that overlap both courthouses; and the
21   clerical error by which voters who have registered with an
22   alternate mailing address were excluded from jury selection.
23   For the reasons I'm about to state, the Court concludes that
24   these allegations do not amount to substantial violations of
25   the JSSA.

L5HGBALD

1              First, the government's decision to seek the

2    indictment in White Plains was appropriate under the

3    circumstances and did not improperly exclude certain

4    populations in the grand jury pool and thus did not contravene

5    the JSSA.  Second, this court, like others in this district,

6    concludes that the exclusion of inactive voters from certain

7    counties represented in the White Plains jury pool does not

8    substantially violate the JSSA, because it is entirely logical

9    for a jury selection process to exclude individuals who have

10   since moved.  Third, with respect to proration, Mr. Balde has

11   not shown that this had a more than minimal affect on the

12   demographic composition of the jury pool, and the decision to

13   prorate overlapping counties in the White Plains jury pool

14   ensured proportional representation of the counties in the

15   district overall.  Finally, exclusion of the voters with

16   alternate mailing addresses in fact increased the

17   representation of black or African-American and Hispanic or

18   Latino populations in the jury pool.  But even then, on this

19   latter point, the Court accepts the expert witness analysis

20   that that would have yielded an additional 1,681 people.

21             Ultimately, the methods that were selected in the jury

22   plan did not affect the random nature or the objectivity of the

23   selection process, and they did not constitute either

24   individually or collectively a substantial failure to comply.

25   In short, this Court is not persuaded that the issues that

L5HGBALD

1    Mr. Balde has identified rise to the level of substantial

2    violations of the JSSA.  They are, at worst, technical

3    violations.  And as such, the Court will not dismiss the

4    indictment on JSSA grounds.

5          For all of these reasons, Mr. Balde's motion to

6    dismiss the indictment is denied.  But I do want to thank the

7    parties, and not merely for remaining on this line so that I

8    could give you the decision, but because I think it was

9    appropriate that these issues be raised so that they can

10   receive the attention of the judges in the Southern District

11   whose job it is or whose duties include that of ensuring that

12   the district's jury plan produces the most equitable and

13   representative jury pools possible, this is especially the case

14   as this is the year where we will be constructing new master

15   and qualified jury wheels.  So I again thank you for your

16   patience.

17         And I think the question for the parties is that of

18   next steps.  Ms. Slavik, are you still on the line?

19         MS. SLAVIK:  I am, your Honor, yes.

20         THE COURT:  Thank you.  Ms. Slavik, I believe the next

21   step would be that of setting a trial date, but I do not know

22   if there is additional discovery between the first and second

23   iterations of the indictment that needs to be produced to

24   Mr. Balde or whether the parties have other things to propose

25   to my attention.

L5HGBALD

1          MS. SLAVIK:  Your Honor, discovery is complete in this

2     case.  The government is not aware of any additional discovery

3     that requires production.  So from the government's

4     perspective, the next step is to set a trial date.

5          THE COURT:  Ms. Willis, let me please turn to you.

6     Ms. Willis, from your perspective, do you believe that you have

7     all of the discovery to which your client is entitled, and do

8     you agree that the next step is one of setting a trial date?

9          MS. WILLIS:  Your Honor, first, yes, I do believe I

10    have all of the discovery that we are entitled to.  I do think

11    that setting a trial date is likely the next step.

12          What I would ask your Honor is, instead of picking one

13    right this moment, I have already identified a second chair for

14    potential trial, that individual is not available for the call

15    today.  I just want to be able to consult with them briefly to

16    make sure I am not missing something else that we should be

17    doing.  I don't think I am.  I think that the trial date is

18    what's coming, but I would just like to be able to check in

19    with that person briefly, your Honor.  And perhaps we could

20    confer with the government.  And I honestly don't know what the

21    Court's schedule is, in terms of approximately when the Court

22    would be available for trial, but I would just like a brief

23    opportunity to consult with my second chair.

24          THE COURT:  Of course.  Let me just give you a couple

25    of thoughts.  I think that is actually the most sensible thing

L5HGBALD

1    to do.

2           It is my understanding that May 15 or thereabouts was

3    the day to submit requests for the third quarter of 2021.  And

4    so therefore, I would not be able to set a trial for the third

5    quarter.  My fourth quarter is actually quite busy, but I can

6    certainly see whether there are spots available.  I might have

7    better luck in the first quarter of 2022, which sounds horrible

8    to say that, but I'm sure the parties are in the same boat that

9    I'm in.  We're just limited in the amount of trials that we can

10   have.  I think I would ask the parties for their thoughts about

11   the fourth quarter of this year and the first quarter of the

12   next.

13          Ms. Willis, something else that I know you know, but I

14   just want to say it, if your client preferred to do this as a

15   bench trial, where I think the principle issue would be the

16   knowledge element that's come to us as a result of *Rehaif*, I

17   might have different availability and I might be able to use a

18   system different than our court's central scheduling system.

19   It is of course your client's right to have trial by jury.  But

20   just given the uniqueness of this case, you may also want to

21   have a bench trial.  I just want to offer that to you as an

22   option.  Of course, both sides would have to agree to it.

23   Ms. Willis, do you think I could have something from you in two

24   weeks or so?

25          MS. WILLIS:  Absolutely, your Honor.  And I will

L5HGBALD

1  definitely discuss his rights with respect to bench trial and

2  jury trial with Mr. Balde as well prior to whatever date your

3  Honor selects to hear back from the parties.

4          THE COURT:  Let me set that date, please, as June 2nd.

5  And I'm setting that specifically because there's the

6  intervening Memorial Day weekend, and that might complicate

7  some things, in terms of getting everyone's schedules together.

8  So I'll take that as the control date for this case.  And then

9  once I hear from you, we'll try to figure out what our schedule

10  is as well.

11          Ms. Slavik, does that work for you, the 2nd of June?

12          MS. SLAVIK:  Yes, your Honor.  The 2nd of June is fine

13  for the government to propose a joint letter to the Court as to

14  trial dates.

15          THE COURT:  Thank you.  And may I ask your office as

16  well -- although it may not be necessary -- to consider the

17  possibility of a bench trial?

18          MS. SLAVIK:  Of course, your Honor.

19          THE COURT:  Thank you.

20          Ms. Slavik, is there an application from the

21  government?

22          MS. SLAVIK:  Yes, your Honor.  The government moves to

23  exclude time under the Speedy Trail Act between now and

24  June 2nd, the date on which the joint letter is due to the

25  Court, to permit the parties to consult about trial dates as

L5HGBALD

1    well as to discuss potential pretrial resolution.

2              THE COURT:  Thank you very much.

3              Ms. Willis, your position, please.

4              MS. WILLIS:  Your Honor, no objection to the exclusion

5    of time.

6              THE COURT:  Thank you so much.  Then let me advise

7    Mr. Balde that, for reasons I know we have talked about in the

8    past, I will be excluding time from today's date through the

9    2nd of June finding that the interests of justice served by

10   excluding this period of time outweigh the interests of the

11   public and of Mr. Balde in particular in getting to trial more

12   quickly.  Everyone was kind enough to allow me the time I

13   needed to resolve these motions.  And I want to allow you the

14   time that you need to figure out next steps in response to them

15   and to talk about the possibility of a bench trail or a jury

16   trial and when such a trial might take place.  And sadly,

17   because of the ongoing pandemic, our trial scheduling system is

18   still one that is centralized and limits, to a degree, my

19   ability to have this trial as quickly as I would like to, and

20   so time is excluded through the 2nd of June.

21             Is there anything else that the government wishes to

22   discuss with me today?

23             MS. SLAVIK:  No, your Honor.

24             THE COURT:  Ms. Slavik, may I understand that you will

25   be getting a copy of this transcript?

L5HGBALD

1          MS. SLAVIK:  Yes, your Honor.

2          THE COURT:  Thank you.

3          Ms. Willis, is there anything that you and your client

4     wish to discuss with me today?

5          MS. WILLIS:  No, your Honor, not at this time.  Thank

6     you.

7          THE COURT:  I thank you all very much.  I wish you

8     continued safety and good health in this pandemic.  We are

9     adjourned.  Thank you.

10          (Adjourned)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25